IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

STEVEN MILLER,

                    Plaintiff,

          v.                                        Civil Action No. 1:08-CV-115

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY


### I.  Introduction

A.    Background

        Plaintiff, Steven Miller, (Claimant), filed a Complaint on May 19, 2008 seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on November 20, 2008.[2]

Claimant filed his Motion for Summary Judgment on December 22, 2008.[3]  Commissioner filed

his Motion for Summary Judgment on January 20, 2009.[4]

B.    The Pleadings

        1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

        2.      Defendant's Brief in Support of Motion for Summary Judgment.

_____

        [1] Docket No. 1.

        [2] Docket No. 14.

        [3] Docket No. 17.

        [4] Docket No. 18.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED**.  The ALJ's decision was supported by substantial evidence of record.  Specifically, the ALJ did not err in his analysis of Claimant's pain; the ALJ's decision not to give controlling weight to Claimant's treating physician was supported by substantial evidence; the ALJ did not err in giving little weight to Tracy Cosner-Shepherd's psychiatric assessments; it was not error for the ALJ not to discuss the VE's statement that the limitations noted by certain examiners would preclude work if they reduced productivity by 20%; the ALJ's analysis of Claimant's mental impairments was supported by substantial evidence and the ALJ did not err by failing to give due deference to the combination of physical and mental impairments.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Supplemental Security Income (SSI) on July 3, 2003 alleging disability since November 30, 2000 (Tr. 61), due to a head and neck injury, depression and bipolar anxiety panic attacks.  (Tr. 76).  The claim was denied initially on December 10, 2003 (Tr. 49).  Thereafter, on December 22, 2003, Claimant filed a Request for Reconsideration.  (Tr. 54).  The claim was denied upon reconsideration on February 9, 2004.  (Tr. 56).  Claimant filed a written request for a hearing on May 9, 2004.  (Tr. 59).  Claimant's request was granted and a hearing was held on August 18, 2004 (Tr. 43, 500-524).

The ALJ issued an unfavorable decision on September 14, 2004 (Tr. 354-65). On October 29, 2004, Claimant filed a request for review of that determination. (Tr. 371). The request for review was granted by the Appeals Council on June 16, 2006 (Tr. 366-70). On December 6, 2006, the case was again heard before an ALJ. (Tr. 525-97). The ALJ again issued an unfavorable decision on March 1, 2007. (Tr. 15-27). On March 23, 2007, Claimant filed a request for review of that determination. (Tr. 14). The request for review was denied by the Appeals Council on May 8, 2008 (Tr. 7-10) Therefore, on May 8, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.      Personal History

Claimant was born on May 24, 1962 and was thirty-eight (38) years old as of the onset date of his alleged disability and forty-five (45) as of the date of the date of the ALJ's decision. (Tr. 61). Claimant was therefore considered a "younger person," under age 50, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). Claimant has an eleventh grade education and has past relevant work as a construction laborer and welder helper. (Tr. 76, 83).

C.      Medical History

The following medical history is relevant to issues relevant to the disposition of the case:

**Tracy L. Cosner-Shepherd (Tr. 162)**

On October 21, 2003, Tracy L. Cosner-Shepherd, M.S., a consultative examining psychologist,

found that claimant was oriented and cooperative, responded appropriately, and maintained good eye contact. He had good thought processes, a broad affect, a tearful mood, no illusions or hallucinations, fair to average insight, mildly deficient judgment, and no suicidal or homicidal ideation. He reported having no manic phases since being on his medication. She opined that claimant had normal social functioning, a deficient memory, moderately deficient concentration, normal persistence, and normal pace.

**S.A. Warrenfeltz, M.D. (Tr. 195)**

On September 5, 2003, Dr. Warrenfeltz opined that claimant could care for himself and work.

**Douglas Shepard, M.D. (Tr. 254)**

On September 11, 2003, Dr. Shepard found that claimant had an essentially normal spine, was in no acute distress and tended to exaggerate his symptoms.

**Michael K. Spodak, M.D. (Tr. 258-262)**

On October 22, 2003, Dr. Spodak, a psychiatrist, found that claimant had an appropriate appearance, coherent speech, a generally preserved mood, a slightly blunted affect, a good memory, and appropriate thought content. Dr. Spodak opined that claimant was not significantly limited in his daily activities, social functioning, or ability to concentrate. He noted that claimant exaggerated symptoms.

**Kip Beard (Tr. 271-75)**

On November 16, 2003, Dr. Beard, a consultative examiner, found claimant had a normal neck, no atrophy, no weakness and no tenderness in his spine.

**State agncy physicians**

Frank Roman, Ed.D. and Joseph Kuzniar, Ed.D. completed psychiatric review technique forms.

They opined claimant was mildly limited in performing activities of daily living, moderately limited in social functioning, moderately limited in maintaining concentration, persistence, or pace, and that he had no episodes of decompensation of extended duration. Dr. Kuzniar further opined that despite his mental limitations, claimant retained the capacity to understand, remember, and carry out one to three step instructions within a low social interaction demand work-setting. Dr. Roman concluded that claimant retained the functional capacity to complete routine, repetitive work.

**December 4, 2003 and February 5, 2004 (Tr. 296, 328) State Agency Physicians**

The state agency physicians opined that claimant could perform medium work.

**Dr. Warrenfeltz (Tr. 467-73) (Tr. 402-05)**

Between October 4, 2004 and July 11, 2006, Dr. Warrenfeltz met with claimant approximately seven times. Claimant reported no neck pain during this time. On August 4, 2004, Dr. Warrenfeltz opined that claimant could perform a range of light work.

**Ms. Cosner-Shepherd (Tr. 408)**

On August 15, 2006, Ms. Cosner-Shepherd noted that claimant had not seen a psychologist in a year-and-a-half. Upon examination, claimant was cooperative, was oriented, and gave appropriate responses. He had good eye contact, relevant speech, a pleasant mood, a broad affect, normal thought-processes, fair insight, mildly deficient judgment, normal concentration, markedly deficient recent memory, normal immediate and remote memory, and normal psychomotor behavior.

**Stephen Nutter, M.D. (Tr. 422-27)**

On August 31, 2006, Dr. Nutter, a state agency examiner, found that claimant had intact grip

strength, fine manipulation skills, intact motor modalities, and a negative straight-leg test. He also opined that claimant could perform a range of light work.

**(Tr. 454)**

On September 19, 2006, while incarcerated, upon physical examination, claimant had no headache and his head and neck appeared normal. Between September and October, while incarcerated, claimant had good energy, fair sleep, fair concentration, no suicidal or homicidal ideation, a fair affect, clear speech, and fair eye contact. He felt that he would deal well with his incarceration, and that he did not need to see a psychologist or psychiatrist.

**Dr. Warrenfeltz (Tr. 479-85)**

On December 11, 2006, Dr. Warrenfeltz opined that pain did not interfere with claimant's daily activities and that he could perform sedentary work.

D.    Testimonial Evidence

Testimony was taken at hearings held on August 18, 2004 and December 6, 2006. The following portions of the testimony are relevant to the disposition of the case:

HEARING HELD ON AUGUST 18, 2004

Q      Mr. Miller, how old are you today?

A      Forty-two, sir.

Q      And who lives at home with you and your wife?

A      My three children.

Q      How old are those two - - - three children?

A      Six, four, and one.

*          *          *

Q    And your educational background is eleventh grade.  Is that correct?

A    Yes, sir.

                    *              *              *

Q    Any difficulty with reading and writing now, Mr. Miller?

A    I have a lot of difficulty actually reading, and taking it all in, and keeping it in, and remembering.  My short term memory's bad.  I could actually read something and forget it within an hour anyway, so - -

                    *              *              *

Q    Okay.  Let's talk about your own work background, Mr. Miller.  You were involved in construction.  You were painting - -

A    Yes, sir.

Q    - - and a contractor.  How about - - what kind of painting jobs did you do?

A    Just residential mainly.

                    *              *              *

Q    Okay.  And you also were a carpenter.

A    Yes, sir.

Q    And you put on siding.

A    Well, I never did much of that, but my last job what it is, it wasn't siding; it was scaffolding.  The last job I got hired through, is what - - that's what I was doing.  I was on a tear down crew - - scaffolding.

Q    And when did you last work anywhere?

A    November the 30th of 2000.

Q        And what happened to you on that day that caused you to stop working?

A        A guy dropped a steel girder on my head and knocked me out and here I am.

Q        Did you have to go to the hospital?

A        Yes, sir.

Q        Stay overnight?

A        Yes, sir.

Q        From - -

A        And I had a bad concussion and f rom that point on, a lot of pain.  I had to wait two years to have my surgery done.

                              *                    *                    *

Q        And the surgery was to your cervical area.

A        Right here.

Q        Was that successful?

A        Somewhat.  It - - I guess it knockec my pain down from a nine to a seven and I'm still taking Percocet four times a day.

                              *                    *                    *

Q        Now, if someone were to ask you then, is it because of the bipolar that you're not working or is it because of the physical injury?

A        Both.

                              *                    *                    *

Q        And what doctor is treating you for your PTSD?

A        The only one I have now is Dr. Warrenfelds [phonetic].  When I lived in

Maryland when my accident happened, I was seeing a psychiatrist once a month, Dr. Gonzales

[phonetic], for I guess two years after my accident. And the last doctor I had seen was the one

that evaluated me for Workmen's Comp was from Baltimore and did a six hour evaluation on

me.

                    *              *              *

Q       Okay. Now, what does that bipolar do to you?

A       I - - for me, every day functioning, I get into places and any area where there's a

lot of people, the first thing I do is I look for an exiit because if something should happen, if I

have a panic attack, I need to get out right away and I'm very claustrophobic. I don't like to be

closed in because back in '80 - - 1981, I had a bad episode when they had first diagnosed me. I

spent two weeks in the hospital and the first week was in a padded room.

                    *              *              *

Q       Do you feel that some day you'll get wekk and go back to work or do you think

you working days are behind you?

A       I don't see that ever happening from what happened to me. I don't because my

motor skills are shot. I don't have the strength I used to have and I can't - - I wouldn't even be

able to tell somebody what to do, let alone tell myself. And I don't want to go back to work and

for me to be negligent and hurt somebody else on the job like I was hurt because it wasn't of my

own doing. It was someone else that hurt me.

Q       And I'm sorry, but which of those psychiatrists are you seeing now?

A       None.

Q       And when did you last see a psychiatrist?

A       I was taking - - how many months ago was I taking counseling in at Keyser?  The last one I had seen was Dr. Spodak.

*               *               *

Q       And what medication are you on right now?

A       I'm taking Percocet, Lithobid, Wellbutrin, and Nexium.

*               *               *

Q       Well, what do you do during the day to keep yourself busy?

A       Walk around in a stupor, actually.  I don't socialize with people very well anymore.  I'm pretty much to myself.  I don't go around my friends as much as I used to or my family.  I only see my mom.

*               *               *

Q       How about alcohol, when's the last time you had a beer?

A       It's been a while, a long time because of my Percocet.

Q       Give me a guess.

A       I know right after my injury, I guess it was two months after I had got hurt, I tried to get pain medication and I couldn't get it at the time because wouldn't cover my prescription, I was drinking to self-medicate because of the pain I was in.  But since I've been on my Percocet, I'm fine with that, so - -

*               *               *

Q       Do you think your drinking has anything to do with your bipolar?

A       No, sir.

*               *               *

Q       Okay.  I'm concerned about what your condition is now and again, if someone were to ask you why you're not working today, what would you tell them?

A       Well, I guess because of severe pain.  I guess three to four times a week I have severe panic attacks in my sleep, which they say that's attributed to the posttraumatic stress disorder from my head injury.  I don't know, it could be.  It could be from other things.  I don't know.  I've never been - - out of all the years I've been in the hospital, I never went under hypnosis or anything.

*               *               *

Q       How do - - how would you classify the type work Mr. Miller's done in the past both as to degree of skill and degree of exertion?

A       Past work performed by the claimant as laborer, construction laborer, to include some duties, painting, and also scaffolding, erection, and taking it down, classify all this work at the heavy exertional level and semi-skilled

Q       Now, acknowledging that Mr. Miller underwent a - - the cervical operation on January 14 of '03 and allowing for proper recovery of that condition, but Mr. Miller indicates that he has a condition which he describes as bipolar.  And if, in fact, the bipolar produced restrictions of activities of daily living mild, difficulties maintaining social functioning moderate, and difficulties in maintaining concentration, persistence, or pace moderate, what impact would that have on a hypothetical person the same, age, education, and work background as Mr. Miller's ability to do light, routine, repetitive type work?

A       Your Honor, for that type of work, the impact would be minimal.

*               *               *

11

Q        And what jobs would you suggest for such a person?

A        From the light, unskilled occupational base, I offer the following examples, choosing jobs that are, in fact, rote and repetitious in nature, first position would be that of assembly worker.  In the United States, there are 82,000 of these positions.  In the local economy, I define the local economy as an area commonly referred to as western Maryland to include the adjacent portions of West Virginia and Pennsylvania.  In that local area, 1,800 of these positions.  Second example would be that of packer and packaging worker, nationally 47,000 exist; in the local economy, 11,000; and the position of machine tender, nationally 62,000 exist and in the local economy, 1,500.  I offer these as examples only, Your Honor.  This is not intended to be an exhaustive list.

Q        Dr. Ryan, we've heard Mr. Miller indicate that he's concerned about his degree of safety, not safety to himself, but worried about his co-workers and I know it's difficulty to quantify that, but can you react to that from a vocational point of view?

A        Yes, Your Honor, the three positions and jobs primarily at the light, unskilled, entry level positions are jobs for the most part that are performed in isolation.  By that I mean not part of a team effort and not working directly with someone else performing a task.  For this reason, it would be my opinion that this factor and this concern for safety of others, safety on the job would not be a

*                *                *

factor to any degree that would lessen or erode the occupational base any farther.

Q        And with the same hypothetical restrictions, what impact would that have on sedentary type work?

A        Again, Your Honor, the impact for repetitious, rote type work would be minimal and examples of jobs from the sedentary, unskilled occupational base, the position of laundry worker, examples of work would be tagging, marking, and spotting; nationally, 46,000 exist.  In the previously described local economy, 900 of these positions are in existence.  The finish machine operator, nationally 51,000 exist and in the local economy, 1,000; and the position of quality control worker, nationally 57,00 exist and in the local economy, 800.  Again, these are presented as examples only.

ALJ:        Your witness, Mr. Rogers.

ATTY:        Dr. Ryan, you've heard Mr. Miller speak about his panic attacks of being in an area.  Do you feel that, you know, considering that part of Mr. Miller's testimony if you consider it to be credible, would that have any impact on his ability to do either the light or the sedentary jobs you have?

VE:        Although getting to a job is not part of the consideration under Social Security Law, certainly an individual who has difficulty leaving their home and if this is extremely difficult for them and would cause them to miss a couple days a week simply because they couldn't overcome fears or feelings of

*                *                *

leaving the home, it would be my opinion they could not perform fulltime employment.  This, of course, would mean they couldn't do the jobs I've given as examples.

ATTY:        Okay.  Was there anything else considering Mr. - - just asking you a question, was there anything else - - if you consider Mr. Miller's testimony to be credible, is there anything else about his testimony about his psychological problems that would cause you

13

any feeling - - Dr. Ryan, this is Mr. Rogers. I was just asking one last question here. Was there anything else in Mr. Miller's testimony if you consider if to be credible that would give you any concern or any doubt that he could perform either of these two - - either categories of jobs that you've stated?

VE:            Well, there's a good bit of testimony concerning the impairment, but what - - going back to actual impairments from a vocational point of view, all of these seem to center on an inability to leave the home and an inability to do this on any regular basis and to keep a regular schedule.

                        *              *              *

HEARING HELD ON DECEMBER 6, 2006

A       That was where I got hurt with Act. Personnel was down there at Mexico Farms doing a tear down job and that's when I got hit in the head by the steel.

Q       Okay. Now, with respect to your impairments - -

A       Um-hum.

Q       - - my review of your record - - and counsel, feel free to interrupt for purposes of - - the prior Administrative Law Judge noted that you had the neck problem and you had surgery.

A       Um-hum.

Q       And that apparently didn't end it. Is that right? The surgery, it didn't help.

A       No.

Q       You still complained of pain?

A       Yeah.

Q       Are you in pain management or - -

A       No sir.

Q       You don't take any medication?

A       I take Percocet six times a day

Q       When did you stop - - he also said alcohol.  When - - what's your - -

A       It's been a while.  I don't - -

Q       - - alcohol use?

A       It varies.  If I go - - like with my bipolar - -

Q       Um-hum.

A       - - it's usually the only time that I ever punish myself like that is if I have a manic episode and that's the only time I'll ever drink is if I am manic or if my anxiety gets out of control.  That's why I take Wellbutrin, and the Xanax, and the Klonopin is for my anxiety.

Q       Now, the - - after the - - after you got hit in the head and you had the surgery, who continued to treat you for your condition, Dr. Sheppard or is he an independent evaluator?

A       Independent.

Q       Who do you consider your treating doctor to be, John Hopkins [sic]?

A       My primary care physician is Dr. Warrenfelds.

Q       Okay.

A       That's the one I've been seeing ever since my accident.  Well, I seen him before my accident, but - -

*          *          *

Q       My problem is I'm looking for medical records that indicate that the next surgery

failed or didn't work and that you have gone into pain management, you're getting injections, you're taking strong pain medications - -

A      Yes, sir.

Q      - - under the supervision of a pain management clinic and I don't see it here.  Can you help me understand that?

A      For one, my medical card wouldn't cover it and - -

Q      Well, wait a minute.  You got $40,000 in a Workers' Comp settlement and you were covered by Workers' Comp during that period of time?

A      At that period of time, I was in pain management.  I took physical therapy nine months prior to me having my surgery done.  From the time of my accident until the time I was approved to have therapy done - -

Q      Um-hum.

A      - - I was taking physical therapy three times a week at Rehab Solutions in McCoole, Maryland, and as the time wore on, once I started getting into the lifting part of lifting the weights above my head, that's when they noticed my gait was different.  My knees started to buckle.  So they in turn - - I had to go to court to fight to have another MRI done and then that's when they found my crushed disk.

Q      In your neck.

A      Yes, sir.

                         *              *              *

Q      After surgery - -

A      Um-hum.

Q        - - you still complained of pain.

A        Yes, sir.

Q        What pain medication are you taking?

A        I'm taking Percocet six times a day, five 325s, four to six times.  It depends on how severe it is, my pain.

Q        And no physical therapy after the surgery?

A        No, sir.

Q        Okay, No other surgery?

A        No, other than having my lymph nodes removed.

                              *                    *                    *

Q        All right.  Now, your mental health treatment - -

A        Yes, sir.

Q        - - are you in therapy?

A        Yes, sir.

Q        Where do you go?

A        I see Dr. Thomas.

Q        Where at?

A        In Keyser.  He's a new psychiatrist to the area.

Q        But when did you start doing that?

A        Last week.

Q        Well, I got to go back to 2000.  You said you were disabled in 2000 and - -

A        Well, now, you have - -

Q        - - you have all of these bipolar complaints and that's six years ago.

A        When I lived in Maryland - -

Q        All right.

A        - - in 2000, I was seeing Dr. Gonzales [phonetic] from the Western Maryland

Health System and I was with him for four years.

Q        Okay.

A        But once I moved from Maryland to West Virginia, they would no longer cover

my medical card.

                        *              *              *

BY ADMINISTRATIVE LAW JUDGE

Q        Before surgery, how far could you walk on level ground?

A        Before the surgery?  Not very far because the jarring in my neck was killing me.

Q        After surgery, how far can you walk through to today on level ground?

A        Probably a half a mile if that and sit down.

Q        Standing before surgery and after surgery?  I'm using that as a baseline with

respect to any physical condition.  That gives us 2000 to 2003 and then - -

A        Um-hum.

Q        - - 2003 to 2006.

A        Right.

Q        Standing the same or affected in some way?

A        It varies.  Like I said, I mean my pain's always there.  If I'm - -

Q        Okay.

A       - - in severe pain, I don't move around a lot because it hurts me too much to do

so.

Q       Okay.  Bending, stooping, or squatting, limited during this period of time?

A       Yes, sir.

Q       By what?

A       By - - I will not even attempt to lift up my little three year old.  I don't lift

anything heavy anymore and - -

*                *                *

Q       Bending - -

A       Bending - -

Q       - - where you bend at the waist.

A       The only time I would ever do that if I was sitting down.

Q       So you can't stand up and then just bend forward - -

A       No, I won't.

Q       - - at any time.

A       Um-um.

Q       You can't bend your knees and squat straight down.

A       I can, but I get dizzy.  The medicine I take is strong, you know, real strong.

*                *                *

Q       Lifting is limited to how much?

A       I don't know.  I will not attempt to lift a heavy weight ever agin in my life.

Q       You don't reach into the refrigerator and get a gallon of milk - -

A No.

Q So what's the heaviest you lift today?

A Now, probably a gallon of milk if that to get it out of the refrigerator.

*   *   *

Q Sitting like you are now, did it change at any time during this period?

A Yes, sir.

Q How long can you sit?

A It's bothering me right now.

Q How long can - -

A I'd like to stand up if I could.

Q I don't have any objections.  Take the - -

A It's just bothering me.

Q - - How long are you able so sit?

A Not very long.  I recline a lot.

Q So your mental condition is bipolar?

A Yes, sir.

Q And how does it affect your memory?

A Cloudy.

*   *   *

BY ADMINISTRATIVE LAW JUDGE

Q So when was the last time you were hospitalized?

A 2002 I think.

Q       This is 2006.

A       Um-hum.

                        *               *               *

Q       Do you have any problems in crowds of people?

A       Yes, I do.

Q       How many make you uncomfortable?

A       Right now I'm uncomfortable.  No, actually my ears sweat and my palms.

                        *               *               *

Q       Do you have any difficulty breathing?

A       Walking up hills, I do.

                        *               *               *

Q       Do you smoke?

A       Yes, sir.

Q       How many years would you say you've done that?

A       Since I was 18.

Q       And you're a pack a per day use?

A       Yeah, not even a pack a day.

                        *               *               *

BY ATTORNEY:

Q       I just want to talk about the - - first of all, the pain.

A       Yeah.

Q       Again, can you tell us is there ever a time when you're not in pain?

A       No.

Q       So the pain is 24/7.

A       Yeah.

Q       And as far as the degree of pain, on average between one and ten, you said

something about a seven - -

A       Seven.

Q       - - or an eight?

A       Yeah.

Q       This is severe pain.

A       Yes.

Q       And where exactly is this pain again?

A       Just down - -

Q       Now, you have to speak because - -

A       Down my spine here, my neck, here, here - -

Q       When he says here - -

A       - - here.

Q       - - he's referring to his head, his shoulders - -

A       Shoulders.

Q       - - and the back of the - -

A       Spine.

                        *              *              *

Q       - - neck.

A        Shooting pain to the middle of my back, my neck this way, this way; more this way than this way here.

Q        Indicating more to the left than to the right.

A        Than to the right, yes.

Q        As far as your bipolar is concerned, you showed me medication - -

A        Um-hum.

Q        - - when we first met here today.

A        Yes, sir.

Q        Can you pull it out of your jacket for me?

A        Klonopins - -

Q        You just got this, you say?

A        Yeah, last week.  It's - -

Q        Who prescribed this?

A        Dr. Thomas.

Q        Dr. Thomas who is - -

A        And that's for - -

Q        - - the doctor that you're now - -

A        Seeing, a psychiatrist.

Q        - - for the first time seeing.

A        Yes.

Atty:    And Your Honor, for the record, this is clonazepam which is equivalent to

Klonopin and it's 0.5 milligrams and he takes it one tablet by mouth three times a day.  And I

also believe,

*       *       *

Your Honor, in the more recent medical information that I sent you, I sent you a pharmacy printout which indicates the other medications that Mr. Miller is currently taking and it goes way back, but it does go right up to '06. I don't - - I can't - -

BY ATTORNEY:

Q      All right, I want you - - I'm going to ask one final question and that is simply this, I'd like you to tell the Judge why is it that you feel you can't work in some kind of a sit down job on an eight hour day, five day a week basis?

A      Because my train of thought is shot. It's gone. The pain that I'm suffering, I would do more harm on the job than I'd do good. I wouldn't be progressive. I'd just be down the tubes. They'd fire me the first week. And the way my sleep pattern is, there's just no way. You know, there's no way I can function. There's no way at all that I could.

Q      How many times a day do you lay down?

A      Twice.

*       *       *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE

Q      Would you classify the exertional and skill level of the claimant's past relevant work?

A      Work as a construction laborer and welder helper, exertional level is heavy, skill level is unskilled.

*       *       *

Q        All right, sir.  And he has a limited education.  He only went to school to the eleventh grade and of course, the past relevant heavy, unskilled work that you've identified.  The state indicated for a physical assessment that such an individual would be able to do medium exertional level of work activity.  Now, in order to support that, counsel - - I mean in terms of where it came from, I'm looking at Exhibit 16F, which is 50 pounds occasionally, 25 pounds frequently, stand and walk 6 hours in an 8 hour day, sits six hours in an 8 hour day, avoid concentrated exposure to extreme cold temperatures.  Now, if we look at 19F, I believe that it's similar, so basically the state agency at 16F and 19F are 50 pounds occasionally, 25 pounds frequently, stand and walk 6 hours in an 8 hour day.  And let me just make sure that I don't leave anything out.  In 19F, there does not appear to be any environmental limitations and so at the medium exertional level, obviously his past relevant work would be eliminated.  Is that correct?

A        That's correct, Your Honor.

Q        The state agency also indicated that in addition to the medium exertional level of work activity for our hypothetical individual with the conditions of the claimant, that such an individual would be limited to unskilled work, simple routine type tasks, and a low social environment.  I translate that as only occasional contact with supervisors, co-workers, and the general

*              *              *

public.  But the state agency indicated low social requirements.  Therefore, if we add that to the medium exertional level of activity - - and I believe that that's supported by an additional exhibit.  Let me make sure that I have that one as well.  Exhibit 14F as well as 21F, low social, which is occasional contact with supervisors, co-workers, and the general public, and simple

routine type, unskilled work activity. Would there be any jobs that you could identify in the national and regional economy that such an individual could perform, the region to be defined by you?

A       The region I'll be using is all of West Virginia, western Maryland and western Pennsylvania. Under the medium exertional level, Your Honor, a warehouse laborer, 1.7 million nationally, 13,000 regionally; kitchen helper, 950,000 nationally, 6,200 regionally. Those are a sampling Your Honor.

ALJ:    Okay. Now, if we consider the functional capacity assessment first of hypothetically Dr. Nutter at Exhibit 24F, which is in the record and prepared just several months ago - - I'm sort of taking these in exertional order. I want to finish Dr. Warrenfelds, but Dr. Nutter said lift and carry 30 pounds.

ATTY:        And Your Honor, I don't understand this I guess because you're saying occasionally 25 and frequently 25, so I don't know what 30 means to be honest with you.

*              *              *

ALJ:        All right. Basically the hypothetical would be that such an individual - - such a hypothetical individual could lift or carry 30 pounds only occasionally, lift or carry 25 pounds - - frequently 25 pounds, standing and walking at least two hours in an eight hour day and I see four hours written by hand to the side.

ATTY:        Yes.

ALJ:    So in other words, stand and walk two hours in an eight hour day and there's four penciled in. Do you agree with that counsel?

ATTY:        Yes I do.

ALJ:        All right.  Sitting - -

VE:         Okay.

ALJ:        - - is less than six hours in an eight hour day and he penciled in four.

Pushing and pulling is limited in the upper and lower extremities to nothing over 30 pounds.

Now, that's where I got the 30 pounds counsel.

ATTY:       Okay.

ALJ:        I went back and tried to reconcile where he got 30.

ATTY:       I see.

ALJ:        Why not 25?

ATTY:       Right.

ALJ:        All right.  And then as far as the postural limitations, never climb any

ladders, ropes, or scaffolds, occasionally crouch, crawl, and stoop, and environmentally, limited

with respect to being exposed to vibration and the hazards of

*                    *                    *

moving machinery at unprotected heights, no ladders, written in.  Now, with respect to that

assessment of doctor - - of the medical specialist at 24F, Dr. Nutter, first of all, what exertional

level of work activity from a vocational standpoint would - - of work would that permit?

VE:         In my opinion it would be light exertional level and the reason I say that is

because he hasn't said what the maximum lift could be, but he has said that the person could lift

25 pounds frequently and you know, at medium level, you can lift 25 frequently, but the problem

there is you can go up to 50 and I'm not sure if he's allowing him to go up to 50.

ALJ:        I understand 30.

27

| VE: | I didn't hear that. |
|---|---|
| ALJ: | 25 occasionally, 25 frequent. |
| ATTY: | Right. |
| ALJ: | Now - - so it's light in your opinion as a vocational expert? |
| VE: | I would say in my opinion it would be light. |
| ALJ: | Okay.  Now, if we add to that the assessment of the consultative examiner, |

Ms. Conner [sic], she has indicated in her assessment that such an individual at 23F, a

hypothetical individual, slight to moderate in carrying out detailed instructions, slight to

moderate in interacting with the public, slight to moderate in interacting appropriately with

supervisors,

*               *               *

slight to moderate in interacting with co-workers, moderate to marked in responding to work

pressures, moderate to marked in responding to changes.  He talked about the - - she talked about

the limitations in physical ability and stamina and pain.  In terms of abilities, I think that we

would need - - since we have the limitations, I would translate that to be, again, low social

interaction; therefore, occasional contact with co-workers, supervisors and the general public and

no fast paced production type of work activity, only low stress type of work activity that does not

require production quotas.  Based on those limitations that she described, I've translated it into

abilities because I have to communicate to you what the claimant can do, not what he can't do.

And I believe that her slight to moderate would translate to occasional, slight to moderate

supervision and co-worker relations and I'm going to go ahead and take it to the general public

as well to no more than occasional.  And then the stress issues would be low stress, no fast paced

production.  So if we add that to Dr. Nutter's hypothetical, would you be able to identify jobs in the national and regional economy such an individual could perform with those limitations?

VE:         Your Honor, could you tell me again Dr. Nutter's standing and walking limitation?

ALJ:        Did you make note of it, counsel?  All right, wait a minute, 20 - -

ATTY:       Yeah, 24F at page 8, I think.

                        *               *               *

ALJ:        Thank you.

ATTY:       It's - -

ALJ:        Dr. Nutter - -

ATTY:       - - at least two hours in an eight hour day with - - you know, I don't - - it looks like four, Your Honor, and I don't know what it is there.  It looks like a degree sign.

ALJ:        Well, I think hours.

ATTY:       I guess that's what - -

ALJ:        Hours and minutes.

ATTY:       I guess that's what doctor - -

ALJ:        Hours are circles, minutes are hash marks.  Is that the way you understand that?

ATTY:       I think that's probably a fair interpretation.

ALJ:        All right.  At least two hours in an eight hour day - -

VE:         With a - -

ALJ:        - - four - -

VE:          And - -

ALJ:         - - yes, added to the right.

VE:          Okay.

ALJ:         The - -

VE:          That's what I thought you had said.

ALJ:         And sitting, less than two in an hour day, four degree - - or four hours.

ATTY:        Less than six, your Honor.

VE:          Less than six.

                        *               *               *

VE:          At the light exertional level, Your Honor, a mail clerk private industry, 202,000 nationally, 2,300 regionally; a garment sorter, 178,000 nationally, 1,500 regionally and I would reduce those numbers in half, Your Honor, because of the stipulations with standing and walking limitations and sitting limitations.

ALJ:         50 percent?

VE:          Yes.

ALJ:         All right.  Counsel, now at this point, based on the remand, the Appeals Council directed that we pose Dr. Warrenfelds' hypothetical.

ATTY:        Yes, Your Honor.

ALJ:         That's at 22F.

ATTY:        Right.

ALJ:         It's extremely difficult in terms of trying to translate it, since you

             represent

the claimant and - -

*            *            *

ATTY:        Mr. Ganoe, the hypothetical would be basically an individual of the same age, education, vocational background as the individual in the hypothetical posed by the Judge. This individual would have the following physical limitations; in ability to lift, they would be limited to lifting 20 pounds at one time maximum and 10 pounds frequently, lifting and carrying. They would be limited further - - would you like to see - -

ALJ:        No, I was just going to pass it over to him - -

ATTY:        Okay.

ALJ:        - - so that he could write at the same time you were - -

ATTY:        Okay.

*            *            *

VE:        Thanks.

ATTY:        The individual would be limited as far as staying on his feet at one time to less than two hours and in an eight hour workday, less than four hours.  Basically there would be no limitation with respect to sitting except that out of an eight hour day, the patient insofar as hours that the patient would alternate between sitting and standing without having to lie down would be less than four hours and in the course of an eight hour workday, the patient would need bed rest less than four hours.  If the patient - - number eight, if the patient needs bed rest during an eight hour workday, how many hours does the patient need?  Less than four.

VE:        Okay.

ATTY:        This would actually the need for bed rest.  Given just those limitations,

would there be work available for such an individual?

VE: I don't feel that there would be, but I don't know what less than four hours means.

ATTY: Well, even if the individual required bed rest for one hour in an eight hour day, let's say - -

VE: No, there would not be any employment available.

ATTY: Okay, thank you.

ALJ: Now, do you wish to - -

ATTY: Yes, I have others.

ALJ: - - the mental, just - -

*       *       *

ATTY: Yeah.

ALJ: - - doctor - -

ATTY: Yeah, the mental. Yes, Your Honor. Okay, if we go then to page 2, further - - wait a minute. No, not page 2.

VE: Three.

ATTY: Page 3.

ALJ: Page - - I think it's page 3.

ATTY: Page 3.

ALJ: Yes.

ATTY: This individual would be further limited as follows; limitations will be slight as far as understanding and remembering short, simple instructions and carrying out short,

simple instructions, moderate in understanding and remembering detailed instructions, marked in carrying out detailed instructions, moderate in the ability to make judgments on simple work-related decisions. Further limitations of significance would be marked limitations in an ability to responds appropriately to work pressures in a usual work setting and moderate limitations to respond appropriately to changes in a routine work setting. Based on those mental limitations, would there be jobs available for this hypothetical individual?

VE:            Well, in all jobs whether they are simple routine or whatever they may be, there's work pressures, you know, in work settings.

ATTY:          Yes, sir.

*               *               *

VE:            And according to this, it would be marked and I doubt that the individual would be able to perform the job adequately to maintain employment.

ATTY:          Okay, thank you.

ALJ:           Now, continuing, I just want to pose the - - to go back to the previous hypothetical that we talked about when we used Dr. Nutter's hypothetical and Dr. Sheppard's hypothetical and just change the exertional level to sedentary instead of light. In other words, I want you to consider sedentary instead of light. In other words, I want you to consider no overhead reaching, but I think we took that into consideration and avoid the hazards of moving machinery and unprotected heights. I think Dr. Nutter took care of that.

VE:            Okay.

ALJ:           Would there be jobs that you could identify if we changed the light hypothetical you previously responded to to sedentary?

ATTY:          Based on Dr. Nutter's RFC?

ALJ:           Based on the hypothetical that I gave - -

ATTY:          Yeah.

ALJ:           - - and the mental limits with Dr. Sheppard.  Well, not Dr. Sheppard - - the consultative examiner.

ATTY:          Yes, Your Honor.

VE:            Under the sedentary work level - - exertional level, a general sorter, 25,000

nationally, 900 regionally; an addresser/stuffer, 240,000 nationally, 2,000 regionally.

                          *                    *                    *

 Those are a sampling, Your Honor.

ALJ:           If the claimant's testimony is supported by the medical evidence of record so as to preclude all exertional levels of work activity and he has no ability to do even an unskilled job and no ability to maintain attention and concentration due to marked limitations resulting from pain and medications, if that would be the case, would there be any jobs you could identify?

VE:            No, there would not be, Your Honor.

ALJ:           Taking into consideration then all of the responses that you gave to the hypotheticals, was it consistent with the <u>Dictionary of Occupational Titles</u>?

VE:            It is, Your Honor, except certain hypotheticals include the requirement to sit or stand during the operation and performance of the job.  That's based on my experience in placing individuals.

ALJ:        Now, counsel, do you have any additional - -

ATTY:       I do, Your Honor.

ALJ:        Please.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q           First of all, just a couple of points of clarification.  You indicated in response to the limitations given when you answered that the mail sorter job would be available, that they would be reduced by 50 percent as a result of the physical - -

A           Yes.

                          *              *              *

Q           - - limitations?

A           Yes.

Q           What about when you add the mental - -

A           The standing.

Q           - - limitations that were given by the Judge in the hypothetical, would that further reduce the number of those jobs?

A           No it would not.

Q           Okay.  All right.  Now, on the Judge's hypothetical which referred back again to Dr. Nutter's RFC at Exhibit 24 at the sedentary level, Dr. Nutter said that sitting was affected and that he could not sit for six hours in an eight hour day, that he could only sit for four hours in an eight hour day.  Isn't that necessarily indicative of an inability to engage in a full range of sedentary work?

A           Well, in a full range, I would say, yes, if the individual is required to sit all day.

35

The examples that were given are examples that fit the criteria.

Q       What about reducing it to four hours rather than just less than six?  You're further limiting, in other words, this individual's ability.  Well, actually and at the sedentary level - - let me just see here.  I just want to refer back to this, 24F.  Okay, no, I'll withdraw that, but would four hours further reduce it or eliminate sedentary work if they could only sit four hours a day?

*              *              *

A       I don't think it would eliminate it.  I think there's jobs that are unskilled that are routing that the person has the option to either sit or stand at their work station.  It's left up to the individual, so no, I don't think it would reduce it.

Q       Okay.  Now, I want you to consider a hypothetical individual - - and Your Honor, I'm going to refer to Exhibit 20F and 21F and 20F is the PRT completed by the state agency physician which indicates degrees of limitations in maintaining social functioning as being moderate and in maintaining concentration, persistence, or pace as being moderate.  So add those limitations from that exhibit.  And then Exhibit 21F has a number of moderate limitations; the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  And once again, I'm referring these are all moderate limitations, and two more, the ability to accept instructions and respond appropriately

to criticism from supervisors and the ability to get along with co-workers or peers without distracting them or

*              *              *

exhibiting behavioral extremes. So I'm adding those to the hypothetical and then I'm going to go to Exhibit 23F and I'm going to add, again - - or some of these may be repeat, so please forgive me because these are different than - - but I think 23F at pages 8 and - - 8, 9, and 10, Your Honor. Again, many are the same, slight to moderate in understanding and remembering detailed instructions and carrying out detailed instructions, slight to moderate in interacting appropriately with the public. Well, I guess I shouldn't add these because the first was moderate, so I better stick with the moderate. But we do have some differences; respond appropriately to work pressures in a usual work setting moderate to marked, and respond appropriately to changes in a routine work setting moderate to marked. Now, my question is this after having said all that and I'm sorry if I belabored the point, but my question is this, assuming that those limitations resulted in a loss of work productivity by 20 percent - - of 20 percent, I should say, so that such an individual's work productivity would be reduced by 20 percent, would there be jobs available for this individual?

      A              No, I don't feel there would be.

      Q              And I believe you've asked about extending full credibility to the testimony that you've heard here today. If that were the testimony of a hypothetical individual and was taken at face value as being fully credible, would there be jobs available for such an individual?

*              *              *

A          No, there would not.

ATTY:          That's my case, Your Honor.  If I have just may be heard in closing briefly.

ALJ:          Proceed.

ATTY:          Well, you know, the state agency doctors have said he meets the A criteria of listings 12.04, 12.06, and is moderate on the B criteria.  I'm not claiming that he meets a listing, but I certainly think that when you consider those evaluations and the limitations, especially the mental limitations involved, Your Honor, and then couple it in combination with the physical impairments that are documented in the record and when considering especially pain and all of the elements that required by Social Security Ruling 96-7P, that a mere choice argument can be made that he does not retain the residual functional capacity to engage in sustained work even at the sedentary level on a regular basis and that would be my argument.

ALJ:          Is your argument also that his alcohol dependence is in sustained full remission?

ATTY:          Thank you, Your Honor.  I - - well, my argument there is that he got - - if he has an alcohol problem, it is not the classic case of an individual who has to drink every day.

CLMT:          Right.

ATTY:          It's a case of alcoholism which exhibits itself only sporadically at times when he is in either manic depression or some panic attack mode that he resorts to alcoholism.

*          *          *

E.          Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how claimant's alleged impairments affect his daily life:

- Naps during the day (Tr. 89)

- Needs help washing and bathing (Tr. 89)

- Is able to prepare soups and sandwiches for lunch (Tr. 90)

- Helps occasionally with light chores (Tr. 90)

- Does none of the shopping (Tr. 91)

- Does not have a license to drive (Tr. 91)

- Reads newspapers and watches tv (Tr. 91)

- Frequently visits his mother and brother (Tr. 92)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ erred at step five of the sequential analysis.  Specifically, Claimant avers that the ALJ failed to take into account medications taken by Claimant to alleviate his cervical spine pain as well as the side effects of the side effects of the medication for his mental impairment.  Furthermore, Claimant argues that the ALJ erred by discrediting the RFC assessments of Dr. Warrenfeltz.  Claimant also argues that the ALJ's analysis of his pain failed to satisfy the step two criteria set forth in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).  Claimant then argues that the ALJ erred in failing to give controlling weight to the opinion of his treating physician, Dr Warrenfeltz.  Claimant takes exception to the fact that the ALJ gave little to no weight to the assessment of the licensed psychologist, Tracy L. Cosner-Shepherd.  Claimant next argues that the

ALJ failed to address the VE's response to the question of whether the limitations noted by one of Claimant's examiners would preclude work if they reduced an individual's productivity by 20%. Claimant goes on to argue that the ALJ failed to follow the special technique for the evaluation of mental impairments set forth in 20 C.F.R. § 416.920(a). Finally, Claimant contends that the ALJ failed to give due deference to the combination of physical and mental impairments.

Commissioner maintains that the ALJ properly weighed the medical opinions of record; the ALJ properly analyzed Claimant's credibility regarding his subjective complaints; the ALJ properly evaluated Claimant's mental impairment; and the ALJ sufficiently considered the combination of Claimant's impairments.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review. Only a final determination of the Commissioner may receive

judicial review.  See 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.    <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

        8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

        10.    Social Security - Residual Functional Capacity.  A Residual Functional Capacity is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id.  It may include

descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  Id.

      11.    Social Security - Vocational Expert. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

      12.    Social Security - Vocational Expert - Hypothetical.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[5], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

_____

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

13. <u>Vocational Expert Purpose.</u> "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." <u>Cline v. Chater</u>, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).[6] "[R]equiring the testimony of a vocational expert is discretionary." <u>Hall v. Harris</u>, 658 F.2d 260, 267 (4th Cir. 1981).

C. <u>Discussion</u>

<u>Did the ALJ Err in His Analysis of Claimant's Pain?</u>

Claimant argues that the ALJ failed to take into account the type, dosage, effectiveness and side effects of medication when evaluating Claimant's pain. Furthermore, Claimant argues that it was error for the ALJ to discredit Dr. Warrenfeltz's RFC assessments because the records failed to reflect complaints of neck pain for two years. Ultimately, Claimant's argument is that the ALJ failed to satisfy step two of the pain analysis set forth in <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996).

Commissioner maintains that the ALJ reasonably afforded less weight to Dr. Warrenfeltz's opinions regarding pain and work-related limitations because the opinions were internally inconsistent, contrary to the objective medical evidence, and inconsistent with other medical opinions of record. Commissioner also argues that the type, dosage, effectiveness and side effects of Claimant's medication further undermined Claimant's credibility and Claimant's assertion that the ALJ failed to take his medication into account is erroneous.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints in <u>Craig</u>. Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, he must

---

[6] See F.N. 6.

first show the existence of a medically determinable impairment that could cause the symptoms alleged.  Id. at 594.  The ALJ must "expressly consider" whether a claimant has such an impairment.  Id. at 596.  If the claimant makes this showing, the ALJ must consider all evidence, including claimant's statements about his symptoms, in determining whether the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.  However, subjective symptoms "may not be dismissed merely because objective evidence of the pain itself...are not present to corroborate the existence of pain."  Id.

Here, the ALJ satisfied the first step of the Craig analysis by expressly considering whether Claimant has the symptoms alleged.  Id. at 596.  The ALJ stated that "[a]fter considering the evidence of record, the undersigned finds that claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. 24).

The ALJ also evaluated a significant amount of evidence at the second step of the Craig inquiry.  The ALJ considered Claimant's activities of daily living and found the fact that Claimant does very little around the house to be "a matter of choice rather than medical necessity given the essentially normal neurological and physical examinations by the consultative and IME physicians."  (Id.).  Craig provides that "evidence of the claimant's daily activities should be considered."  Craig at 595.  Evidence of daily activities may show a person is not disabled.  Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992).  Claimant admitted that his mental

impairment did not significantly limit his activities of daily living (Tr. 258) and that he could dress himself, shave, prepare simple meals, help with household chores, read the newspaper, watch several hours of television each day and visit with his family and friends. (Tr. 89-93, 537).

Although Claimant argues that the ALJ failed to properly account for the medications Claimant takes to alleviate the pain in and around his cervical spine, the Court finds this argument is without merit. Regarding Claimant's subjective complaints of pain, the ALJ found Claimant to not be entirely credible. The ALJ found that the Claimant's testimony that he cannot sit for very long lacked credibility because there are no objective clinical signs or imaging studies of any severe lumbar or other impairment that would limit his ability to sit. (Tr. 24). Furthermore, the ALJ cited Claimant's poor work history as evidence of a significant secondary gain motivation to exaggerate his subjective symptoms. Finally, and with specific regard to Claimant's medications, the ALJ noted that Claimant's pain "is controlled by medication." (Tr. 24). The ALJ cited the pain questionnaire completed by Dr. Warrenfeltz on December 11, 2006 which also lends further support to the ALJ's findings regarding Claimant's activities of daily living because Dr. Warrenfeltz opined that "while pain is present, it does not interfere with [Claimant's] activities of daily living and is controlled by medication."

The Court finds that the ALJ's findings regarding Claimant's subjective complaints of pain and the effect of his medications on that pain are supported by substantial evidence.

Did the ALJ Err by Failing to Give Controlling Weight to Claimant's Treating Physician?

Claimant further argues that the ALJ discredited the RFC assessments of Dr. Warrenfeltz

because treatment records had not reflected complaints of neck pain for two years.[7]  Claimant maintains that the records do not diminish the fact that his neck and back impairments were permanent and required medication to alleviate the pain.  Claimant contends that the ALJ erred by not giving controlling weight to Dr. Warrenfeltz' opinions.  Commissioner argues that the ALJ reasonable afforded less weight to Dr. Warrenfeltz' opinions because the opinions were internally inconsistent.

A treating physician's opinion will be entitled to controlling weight under some circumstances.  The opinion must be (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.972(d)(2).  A treating physician's opinion will be disregarded if persuasive contrary evidence exists.  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984).  To decide whether an impairment is adequately supported by medical evidence, the Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508; Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).  Regardless of a physician's opinion, the ultimate legal determination of Claimant's impairments remains with the Commissioner.  20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983).  Furthermore, an opinion regarding a claimant's RFC is "never entitled to controlling weight or special significance.  20 C.F.R. § 416.927(d)(2),(3) (2008).  The ALJ's findings will be upheld as long

_____

[7] Although Claimant is specifically challenging the ALJ's discrediting of Dr. Warrenfeltz' RFC assessments, the Court reads the argument to be more strongly related to the ALJ's handling of a treating physician's opinions than to a challenge of the ALJ's RFC finding.

as substantial evidence supports them.  <u>Hays</u>, 907 F.2d at 1456.

The Court will consider Dr. Warrenfeltz's RFC assessments.  Dr. Warrenfeltz had treated Claimant since 1998.  (Tr. 78).  The record clearly shows Dr. Warrenfeltz to be Claimant's treating physician.  Dr. Warrenfeltz completed at least two Medical Assessment of Ability to do Work-Related Activities (Physical).  The most recent is dated December 11, 2006 (Tr. 481).  A prior one is dated August 4, 2004.  (Tr. 402).

The ALJ considered both of these assessments in his opinion.  The ALJ found that the limitations noted by Dr. Warrenfeltz in his medical source statement (MSS) dated December 11, 2006 "lack objective support in the longitudinal medical evidence of record, and is given little weight."  (Tr. 24).  The ALJ cited two IME specialists reports dated April 14, 2003 and September 11, 2003 that found "few abnormal clinical signs regarding the claimant's cervical impairment."  (<u>Id.</u>).  Likewise, a consultative physical examination on November 16, 2003 showed "no weakness or atrophy with only 'maybe mildly diminished' grip strength on the left."  (<u>Id.</u>).  Another examining consultative physician noted no significant abnormal objective clinical signs reporting only subjective complaints of neck and back pain with corresponding decreased range of motion.  This physician opined in a MSS that the claimant retained the ability to perform a range of light work with four hours of standing and/or walking and four hours of sitting.  (<u>Id.</u>).

The ALJ also discussed Dr. Warrenfeltz' pain questionnaire where Dr. Warrenfeltz stated that the claimant "only achieved mild relief from his neck pain from the surgery."  (<u>Id.</u>).  The ALJ found this statement to be unsupported by Dr. Warrenfeltz' own treatment records that had not noted any complaints of neck pain for two years.  (<u>Id.</u>).

The ALJ also specifically discussed Dr. Warrenfeltz' MSS dated August 4, 2004 which limited Claimant to a range of light work, but reported the Claimant would have to recline for four hours everyday. The ALJ stated "[s]ince the objective medical evidence of record does not support this extreme limitation of having to lie down for four hours of the workday, no weight is given to this limitation that appears to be based upon the claimant's subjective complaints that are not very credible.

The ALJ went on to address Dr. Warrenfeltz' repeated completed statements that the Claimant was unable to work since December 4, 2000. The ALJ found that Claimant would be unable to return to his past heavy work due to his impairments, "the evidence does not show that the claimant could perform no work." (Id.).

The Court believes substantial evidence supports the ALJ's consideration of Dr. Warrenfeltz' opinion. Dr. Warrenfeltz' opinions were internally inconsistent and not based upon objective medical evidence. See 20 C.F.R. § 416.927(c)(2), (d)(2),(3) (2008). Dr. Warrenfeltz opined that pain did not interfere with Claimant's daily activities, said medication controlled his pain, and did not recommend other pain management. (Tr. 479, 467-73). Dr. Warrenfeltz' opinions were also inconsistent with the other medical opinions of record. See 20 C.F.R. § 416.927(d)(2),(4) (2008). Two state agency physicians opined that Claimant could perform medium work with no postural limitations or manipulative limitations. (Tr. 296-98, 328-30). The ALJ, therefore, properly credited Dr. Warrenfeltz' opinions less weight. It should be noted, however, that the ALJ did not entirely discredit Dr. Warrenfeltz' opinion in assessing Claimant's RFC, which limited Claimant to sedentary work with a sit/stand option and only unskilled work involving no more than occasional interaction with supervisors, co-workers, and the general

public.  (Tr. 22).

<u>Did the ALJ Err in His Analysis of Claimant's Mental Impairments?</u>

Claimant maintains that the ALJ gave little to no weight to the assessment of licensed psychologist Tracy Cosner-Shepherd, who examined Claimant on two separate occasions. Claimant contends that the ALJ erred by relying upon the assessments of non-examining, non-treating medical examiners.  Commissioner responds by arguing that the ALJ evaluated Claimant's mental impairments in accordance with 20 C.F.R. § 416.920(a) (2008).

It is the duty of the ALJ and not the courts to make findings of fact and resolve conflicts in the evidence.  <u>Hayes</u>, 907 F.2d at 1456.  The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner.  <u>Id.</u>

Ms. Cosner-Shepherd is not a treating physician.  The ALJ gave little to no weight to Ms. Cosner-Shepherd's opinions for many of the same reasons he rejected Dr. Warrenfeltz' opinions. The ALJ stated that Ms. Cosner'Shepherd's finding that Claimant would have moderate to marked impairment in responding to work pressures and changes was "based solely upon the claimant's subjective complaints, and not supported by the evidence of record including the claimant's incarceration wherein he had no significant problems with panic attacks or depression.  (Tr. 25).

The ALJ properly evaluated Claimant's mental impairments in accordance with 20 C.F.R. § 416.920(a) (2008).  According to the regulations, the ALJ's decision must include: (1) the medical evidence and functional limitations considered, and (2) the degree of limitation.  <u>Id.</u> § 416.920(e)(2).  Here, the ALJ found Claimant to have mild limitations in activities of daily

living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation of extended duration. (Tr. 22).[8]

The ALJ relied upon the following substantial evidence to support his findings. Claimant has "relatively well-controlled mental impairments when he remains compliant with treatment." (Tr. 21). "Dr. Warrenfeltz's treatment records over the five year period rarely noted any ongoing difficulties with panic attacks, and had no mention of panic attacks over the past two years." (Tr. 21 (citations omitted)). An examining psychiatrist opined that Claimant "had essentially no difficulties with activities of daily living or social functioning, and only mild difficulties with concentration and adaptation." (Tr. 21 (citations omitted)). Two consultative psychological evaluations revealed that Claimant had no more than moderate difficulties in social functioning and in concentration, persistence, and pace. (Tr. 21-22).

The ALJ properly evaluated Claimant's mental impairments and his findings are supported by substantial evidence of record.

## Did the ALJ Err by Failing to Address the VE's Statement that the Limitations Noted by the Examiners Would Preclude Work if they Reduced Productivity by 20%?

At the hearing, the VE testified that the limitations noted by one of the examiners would

---

[8] Claimant argues that it was error for the ALJ to repeat this conclusion reached by the state agency examiners' rather than adopt his own reasoning. The Court disagrees with Claimant's reading of 20 C.F.R. § 416.920a. The ALJ is not required to "adopt his own reasoning" as Claimant would have this Court believe. The ALJ's role is to evaluate the evidence before him. It is his job to evaluate the Claimant based on the entirety of the record before him. It is not error for him to agree with a particular piece of evidence. Here, the ALJ adopted the state agency examiners' conclusions regarding Claimant's activities of daily living, social functioning, concentration, persistence and pace, and decompensation. This Court finds that the ALJ's finding that Claimant has mild limitations in these functional areas was supported by substantial evidence and in accordance with 20 C.F.R. § 416.920a.

preclude work if they reduced an individual's productivity by 20%. (Tr. 593). Claimant

contends it was error for the ALJ not to address this in his opinion.

Here the ALJ found Claimant had the RFC to perform sedentary work with a sit/stand

option, which is unskilled and requires no more than occasional interaction with supervisors, co-

workers and the general public. (Tr. 22). He found work existed in significant numbers in the

national economy. (Tr. 27).

"The purpose of bringing in a vocational expert is to assist the ALJ in determining

whether there is work available in the national economy which the particular claimant can

perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19,

1996). "[R]equiring the testimony of a vocational expert is discretionary." Hall v. Harris, 658

F.2d 260, 267 (4th Cir. 1981). Moreover, "the ALJ is granted great latitude in posing

hypothetical questions and is free to accept or reject suggested restrictions so long as there is

substantial evidence to support the ultimate question." Koonce v. Apfel, No. 98-1144, 1999 WL

7864, at *5 (4th Cir. Jan. 11, 1999).

Here, the ALJ properly discounted the credibility of Claimant's subjective allegations of

pain in light of the entire record and concluded that the Claimant was capable of performing

sedentary work after taking into account Claimant's impairments. Therefore, substantial

evidence exists supporting the ALJ's decision to find Claimant capable of performing sedentary

work and it was not error for the ALJ not to address the specific portion of the VE's testimony

that Claimant has put at issue in this case.

Did the ALJ Err by Failing to Give Due Deference to the Combination of Physical and Mental
Impairments?

Claimant argues that the ALJ failed to give due deference to the combination of his

physical and mental impairments. Claimant argues that the ALJ failed to address the synergistic affect of his various maladies on his ability to work. Commissioner cites Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1991) for the proposition that an ALJ properly considers impairments in combination where he discusses each impairment separately and then finds that claimant's impairments, when considered together, did not prevent him from working.

20 C.F.R. § 404.1520 states that if a person has a severe impairment and is not engaging in substantial gainful activity, a disability claim will be granted if the Claimant has an impairment or combination of impairments that either meets or equals the criteria of an impairment listed in Appendix 1. The ALJ is required to compare the symptoms, signs and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. § 404.1526(a).

In his opinion, the ALJ clearly considered the combined effects of Claimant's impairments. In fact, he specifically stated the necessity to "determine whether the claimant has a medically determinable impairment that is 'severe' or *a combination of impairments* that is 'severe.'" (Tr. 19 (emphasis added)). Furthermore, the ALJ made a specific finding that Claimant had a "*combination of severe impairments*." (Tr. 20 (emphasis added)). He went on to specifically list Claimant's impairments to be status post cervical discectomy and fusion at C5-6; bipolar disorder; an anxiety disorder; and a history of alcohol dependence. (Id.). The ALJ then methodically went through the severe impairments analyzing whether any of them met a Listed impairment. (Tr. 20-22).

The ALJ properly considered all of Claimant's severe impairments both individually and collectively and his finding that work exists in significant numbers in the national economy that

Claimant could perform was supported by substantial evidence of record.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED**.  The ALJ's decision was supported by substantial evidence of record.  Specifically, the ALJ did not err in his analysis of Claimant's pain; the ALJ's decision not to give controlling weight to Claimant's treating physician was supported by substantial evidence; the ALJ did not err in giving little weight to Tracy Cosner-Shepherd's psychiatric assessments; it was not error for the ALJ not to discuss the VE's statement that the limitations noted by certain examiners would preclude work if they reduced productivity by 20%; the ALJ's analysis of Claimant's mental impairments was supported by substantial evidence and the ALJ did not err by failing to give due deference to the combination of physical and mental impairments.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: July 21, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE